UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DEVANTE SPENCER,

                              Petitioner,

              v.

CHRISTOPHER WEHYL, Superintendent Wende
Correctional Facility, Alden, New York,

                              Respondent.
_____

<u>DECISION AND ORDER</u>

22-CV-6286DGL

        Petitioner Devante Spencer, through counsel, has filed a petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254, challenging his 2015 conviction following a jury trial in

New York Supreme Court, Monroe County, of second-degree murder and criminal possession of

a weapon in the second degree.  The New York State Attorney General ("State") has filed a

response to the petition on behalf of the respondent.  For the reasons that follow, the petition is

denied.


**BACKGROUND**

**I.  Underlying Events**

        On April 9, 2012 at around 7:00 p.m., three individuals–Lawrence Richardson, Kenneth

Mitchell and Clifford Gardner–were walking on Dayton Street in the City of Rochester when

they were shot by another individual with a .45 caliber handgun.  All three victims were taken by

ambulance to a hospital.  Mitchell and Gardner survived their wounds; despite intensive medical

treatment, Richardson died within an hour of his arrival at the hospital.

A police investigation ensued, and in May 2014 a Monroe County grand jury returned a five-count indictment against Spencer and codefendant Chauncey Reid, charging each of them with one count of Murder in the Second Degree, two counts of Assault in the First Degree, one count of Criminal Use of a Firearm in the First Degree, and one count of Criminal Possession of a Weapon.  The case proceeded to a jury trial of both defendants in March 2015.  Both were convicted on all counts.

Spencer's grounds for relief in his present petition all relate to what he claims was inadequate disclosure prior to trial regarding a prosecution witness, Tashaka Mitchum.  At trial, Mitchum was the primary witness linking the defendants directly to the shooting.  The gist of Spencer's arguments in his habeas petition is that he was denied due process and other trial-related rights because he was not provided with various materials (such as interview transcripts and police notes) pertaining to Mitchum before trial, and that as a result his trial attorney was not able to effectively cross-examine Mitchum.  An understanding of the issues presented in Spencer's petition therefore requires familiarity with the pretrial proceedings, particularly as they relate to disclosure concerning Mitchum.

## II.  Pretrial Proceedings and Disclosure

At some point after Spencer's arraignment, the prosecutor moved *ex parte* for a protective order, sealing some parts of the record relating to Mitchum, and providing for redaction of discoverable materials as to Mitchum.  The trial judge (James J. Piampiano, J.) granted the motion and issued a protective order on June 9, 2014.  The motion and the order are referred to in parts of the record, *see* State Record ("SR") (Dkt. #15-2) at 108, 817, but neither is contained in the record before this Court.  *See* Resp. Mem. of Law (Dkt. #14) at 1.  It appears,

however, that the order stated that the prosecution had demonstrated good cause for the relief requested, and that the prosecutor would have to comply with any court order regarding a time before trial in which the prosecution needed to turn over unredacted copies of all items.  (SR 817.)

On July 25, 2014, Spencer, through his attorney, filed an omnibus motion seeking, *inter alia*, disclosure of all evidence favorable to the defendant pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  (SR 9.)  In its response to the motion, the prosecution asked that the previously-issued protective order be continued.  (SR 108.)

At oral argument of Spencer's motion, Spencer's counsel stated that he was sure that if there were any *Brady* materials, they would be provided to him.  (Dkt. #15-4 at 15.)  With respect to counsel's request for a list of prosecution witnesses, the court granted the prosecutor's request to keep the protective order in place, and denied Spencer's request for witnesses' names.

After stating, "I am receiving the law enforcement notes," Spencer's attorney added that he was requesting "informant information" pursuant to *People v. Rosario*, 9 N.Y.2d 286 (1961), which requires the prosecution to disclose to the defense all of a prosecution witness's prior recorded statements that are material to that witness's testimony.  Counsel stated that he presumed, based on the information in his possession, that "there is an informant" and that "someone gave information that ... allegedly my client is involved in this incident."  *Id.* at 20. The court denied the request, stating, "There is no legal basis."  *Id.*

Spencer's attorney also asked the court "to unseal the redacted statements, reports that have been sealed, for [his] ability to review" prior to trial.  *Id.* at 22.  Judge Piampiano stated that he would reserve decision on that request until the trial had been scheduled.  *Id.* at 13.

On October 9, 2014, the court scheduled trial for March 9, 2015.  (Dkt. #15-4 at 89.)  On February 25, 2015, the court lifted the protective order, and ordered the prosecution to provide, by March 3, 2015, all witness statements required by New York law and all unredacted discovery, as well as, "immediately and without exception, any exculpatory material not previously disclosed."  (SR 111.)

On February 27, 2015, the prosecutor sent a letter to both Spencer's and Reid's attorneys, stating that pursuant to *Brady*, she was informing them that in connection with a federal prosecution against him and others for various drug and firearm offenses, Mitchum had entered into a plea agreement in federal court in April 2014.  The prosecutor also explained that the plea agreement included a cooperation provision, which obligated Mitchum to provide complete and truthful information regarding his knowledge of any criminal activity "in any way related to violent crimes including homicide."  (SR 112.)  The letter stated that Mitchum was currently facing a minimum twenty-year sentence under the United States Sentencing Guidelines, and that if the United States Attorney deemed Mitchum to have provided substantial assistance, the Government would move for a downward departure at sentencing.

On March 2, 2015, the prosecutor produced to defense counsel the unredacted versions of several documents that had previously been turned over in redacted form.  She also produced the hearing and grand jury testimony of RPD Investigator Jennifer Morales and several other police investigators, officers, and technicians, the grand jury testimony of several prosecution witnesses including Mitchum, and information about the prior convictions of those witnesses, as well as medical records pertaining to Mitchell and Gardner.  (SR. 113-14.)  As to Mitchum specifically, the prosecutor produced the cooperation agreement referenced in her February 27 *Brady* letter. She further turned over redacted transcripts of interviews that the RPD had conducted with

Mitchum in July and August of 2012, as well as the recordings of the disclosed portions of the interviews, and a photograph from Mitchum's Facebook account depicting an AMT .45-caliber handgun.

At an appearance on March 5, 2015, Spencer's attorney complained about the timing of the March 2 disclosures so close to the start of trial, which he contended necessitated an adjournment of the trial so that he would have time to review all the documents.  Counsel further stated that he had requested information about informants in July 2014, but had learned about Mitchum only a few days earlier.  Counsel asserted that in order to impeach Mitchum effectively, he needed Mitchum's probation report, plea agreement in the federal case, and the Government's 5K1.1 application for a downward departure, among other items.  (Dkt. #15-4 at 94-101.)

After hearing from Reid's attorney and the prosecutor, the court denied counsel's application for an adjournment.  The court stated that relief was unwarranted in light of the time frame for discovery set forth in the court's February 25 order.  The court added that because the presentation of evidence was unlikely to begin until the morning of March 11, the defense would have eight or nine days to review the discovery.  *Id.* at 107-08.  That same day, the court issued subpoenas duces tecum addressed to the U.S. Department of Justice, U.S. Attorney's Office, the U.S. Department of Probation, and the RPD and Monroe County Sheriff's Department, for various materials pertaining to Mitchum, including accusatory instruments, criminal complaints, criminal records, plea and cooperation agreements, notes of law enforcement personnel, and a presentence investigation report.  (SR 115-25.)

The next day, May 6, 2015, codefendant Reid's attorney moved to preclude Mitchum's testimony, stating that he had not been provided details of Mitchum's conversations with the

police, and that counsel was therefore "in no position to cross-examine" Mitchum effectively.
(Dkt. #15-4 at 185.)  The court asked the prosecutor if the transcripts or notes from those
conversations contained any *Brady* material.  The prosecutor replied that they did not, and that
the prosecution's prior disclosures "encompass anything related to *Brady* in this particular case
with respect to this witness."  *Id.* at 186-87.  The court then reminded the prosecutor of her
continuing obligations under *Brady*.  *Id.* at 187.

The trial began on March 9, 2015.  On March 12, an RPD officer testified that he had
taken investigative notes that he had never turned over to the prosecution, Dkt. #15-5 at 294,
300.  On March 12, the prosecutor informed the court by letter that in the wake of that testimony,
she had checked to make sure that the prosecution had in its possession, and had turned over to
defense counsel, all relevant notes taken by law enforcement witnesses, and that in doing so she
learned that there were additional notes by Investigator Morales pertaining to proffer sessions
with Mitchum.  She added that "because the proffer sessions also deal with sensitive information
related to other, non-related investigations, the People seek to turn them over in redacted form,
as set forth more particularly in the People's Ex Parte Application to the Court."  The prosecutor
stated that she was "providing the Court with a copy of the original notes of Inv. Morales,
together with a copy of the People's proposed redactions, for *in camera* inspection," and that she
"ask[ed] the Court to make a ruling with respect to what portion of the notes must be given to
defense counsel."  (SR 128.)

On the morning of March 16, 2015, outside the presence of the jury, Spencer's attorney
moved for a mistrial.  He confirmed that he had received the redacted notes on March 14, Dkt.
#15-5 at 543, but he asserted that he had not had enough time to review the notes and that he
should be given the unredacted notes.  The court denied both requests, stating that the notes that

had been given to counsel were "not that voluminous." (Dkt. #15-5 at 543.) The trial judge also denied counsel's request for a severance, stating that he saw nothing in Morales's notes suggesting that counsel would "ha[ve] to attack Mr. Reid" to effectively cross-examine Mitchum. *Id.* at 546.

The court also granted the prosecutor's *ex parte* motion concerning the notes, stating that "to release the notes unredacted would compromise various pending matters ... ." (Dkt. #15-5 at 538.) The court found that the redacted notes would be sufficient to enable defense counsel to adequately conduct cross-examination, and ordered that the unredacted notes be sealed, *id.* That same day, the court entered a written order memorializing its ruling, and stating that "the unredacted versions of those documents contained under "Exhibit A" [*i.e.*, Morales's Mitchum interview notes] are not to be turned over" and were to be sealed. (Dkt. #15-2 at 641-42.)

## III. Evidence at Trial

At trial, the prosecution presented evidence, and argued to the jury, that Spencer had a grudge against Richardson, and that on the day of the shooting, he drove Reid to Dayton Street, where they saw Richardson and his two companions, Reid got out of the vehicle and shot the three men using a handgun supplied by Spencer, and Reid then got back in the vehicle and he and Spencer fled the scene.

Neither of the two victims who survived the shooting, Mitchell and Gardner, was able to identify the shooter. They testified that just before they were shot, the shooter had walked past them on the sidewalk, and that they had not paid much attention to him at the time. They also testified that they did not get a good look at his face, which was obscured by the pulled-up hood of his sweatshirt. Both were shot in the back a few seconds after he walked by.

As stated, the primary prosecution witness linking Spencer and Reid to the shooting was Mitchum.  He stated that on the day of the shooting, he was standing on the corner of Carter Street and Roycroft Drive in Rochester, where he had gone to sell "dime bags" of marijuana. While he was standing there, a gold Honda Odyssey minivan drove up; Spencer was driving, and Reid was in the front passenger seat.  Mitchum testified that he had known both men for years, and that he was on good terms with both.

According to Mitchum, Spencer told him that he had seen "the little dude that we stabbed up," Trial Transcript ("Tr.") at 1201.[1]  That was an apparent reference to Richardson; Mitchum also testified that in June or July of 2011, he, Spencer, and four other people had been involved in an altercation with Richardson, in which Richardson was beaten up and Spencer and another participant stabbed Richardson with pocket knives.  According to Mitchum, that was the only occasion on which he and Spencer had been involved in stabbing someone.  *Id.*

Mitchum testified that Spencer said he was "about to go put some work in," which Mitchum took to mean he was going to shoot someone.  *Id.*  Spencer asked Mitchum to come along, but Mitchum declined.  *Id.*  The van then left, headed west.

After Spencer and Reid were gone, a Rochester Police Department ("RPD") car pulled up to where Mitchum was standing.  Mitchum testified that it appeared that the officer was about to exit the vehicle when the sound of gunshots could be heard coming from the west.  The officer then drove away, headed west.  *Id.* at 1207.

Mitchum testified that about four or five hours after seeing Spencer and Reid in their van, he saw Reid at a convenience store.  He stated that he and Reid got into Reid's car, which was

---

[1] The trial transcript spans three volumes, with pages 1-600 comprising pages 199-797 of Dkt. #15-4, pages 601-1200 in Dkt. #15-5, and pages 1201-2211 at pages 1-1010 of Dkt. #15-6.

parked on the street, and had a conversation in which Reid told him what happened after he and Spencer drove away in their van.  According to Mitchum, Reid "told [him] that they rolled by Dayton Street, and Devante let him out, and he walked down the street past three individuals, and once he got behind them, he turned around and started firing on them, and how the kids ran, and he was surprised that they didn't drop because the only thing he believed was keeping them up was pure adrenaline." *Id.* at 1211.

Mitchum further testified that Reid "told [him] that he ran around the corner to the car to get in, and when he got to the door -- when he got to the car, and tried to grab the door handle, Devante pulled off about three houses down and then stopped.  Then he ran to the car again, and Devante pulled off again and then stopped." *Id.* at 1212.

Mitchum testified that he spoke with Spencer in person the following day.  Mitchum said that Spencer told him that at the time of the shooting, "he dropped Chauncey off, and he rode around the corner to Fairbanks to wait, and when Chauncey ran to the car, he pulled off, stopped, pulled off again, and then stopped and then finally let him in." *Id.* at 1213-14.  He testified that Spencer also told him that "he was thinking about crashing" the van to get rid of it, and that about a week after that conversation, Spencer showed him a video "of him in another car following the van, somebody was driving, and they crashed into a tree." *Id.* at 1215.  Mitchum said that Spencer later told him that the van had been crashed on Cummings Street.  *Id.* at 1216.

While that comprises Mitchum's testimony relating directly to the events of April 9, he also testified about other matters that further tended to incriminate Spencer.  He testified, for instance, that in the Summer of 2012, he was riding in a car with Reid when they "rode by Dayton Street, and [Reid] told [Mitchum] that he missed the little fifth that Devante had." *Id.* at

1220.  Mitchum testified that "little fifth" was a reference to "[t]he compact .45" caliber handgun that Reid has used on April 9.  *Id.* at 1221.

Mitchum also testified that he had seen that weapon before the shooting.  He stated that in March 2012, he, Spencer, Reid and a man named Michael Smith were at Smith's house when Spencer showed them an AMT .45 caliber handgun he had recently acquired.  He testified that Spencer said that he had traded another gun for it, and that Spencer took a photograph of it, which was later posted on Mitchum's Facebook page.  According to Mitchum, Spencer posted it on Mitchum's page because "Devante didn't have one [*i.e.*, a Facebook page] at the time."  *Id.* at 1223.

Mitchum further testified about a statement that Spencer made to him in May 2012.  On May 1, Reid had been shot by someone on Carter Street, leaving him paralyzed.  Mitchum stated that he had a telephone conversation with Spencer not long afterwards, in which Spencer said that "we were going to go get revenge for Chauncey being shot ... ."  Mitchum testified that Spencer "asked me did I have a firearm on me," and when Mitchum replied that he did not, Spencer said, "All right, good, because I got one for you."  According to Mitchum, Spencer's "exact words" were, "I got the one I did that junk on Dayton Street with."  *Id.* at 1231-32.

Mitchum was also asked at trial about a conversation he said he had with Spencer in the fall of 2011, several months before the shooting.  He testified that Spencer told him that Richardson was "lucky" because "on another day [Spencer] saw Lawrence Richardson and tried to get behind him and shoot him there, but the gun wouldn't operate."  Tr. at 1193.  Mitchum said that Spencer told him this had occurred "like the day before" their conversation.  Tr. at 1194.

-10-

The prosecution also presented other witnesses and evidence, some of which are discussed below.  The defense called no witnesses.

## IV.  Verdict, Sentence and Post-Trial Proceedings

On March 23, 2015, the jury convicted Spencer and Reid on all counts.  On April 16, 2015, the County Court sentenced Spencer to an indeterminate prison term of 25 years to life for murder, a determinate 25-year prison term and 5-year period of post-release supervision for each assault count (consecutive to each other and to his sentence for murder), a determinate 25-year prison term and 5-year period of post-release supervision for criminal use of a firearm (concurrent with all other sentences), and a determinate 15-year prison term and 5-year period of post-release supervision for criminal possession of a weapon (consecutive to the sentences for murder and assault).  The court also denied Spencer's motion pursuant to C.P.L. § 330.30 for an order setting aside the verdict on the basis of insufficient evidence.

On direct appeal, Spencer argued that:  (1) the evidence was legally insufficient to support his murder and assault convictions; (2) the verdict as to all counts was against the weight of the evidence; (3) the admission of certain evidence rendered the trial unfair; (4) the trial court's denial of his severance applications warranted a new trial; (5) the court wrongly denied Spencer's *Batson* challenge to the jury composition; and (6) the court improperly denied his § 330.30 motion.

The Appellate Division unanimously affirmed Spencer's judgment of conviction with respect to the charges of murder and criminal possession of a weapon, finding the evidence as to those counts "overwhelming."  *People v. Spencer*, 181 A.D.3d 1257, 1262 (4th Dep't 2020).  With one justice dissenting, the five-justice panel reversed the convictions of assault and

criminal use of a firearm, finding the evidence on those counts legally insufficient because there was insufficient evidence that Spencer knew that either of the assault victims (Gardner and Mitchell) was present or that he intended any harm to either of them.  *Id.* at 1259.[2]

The court also held that the evidence was legally sufficient to support the murder conviction, stating that "the People presented evidence establishing that defendant shared his codefendant's intent to kill the victim and intentionally aided the codefendant by, inter alia, planning the shooting beforehand, informing the codefendant where the victim was located, driving the codefendant to that location, providing the weapon used in the shooting, and driving the codefendant away from the scene immediately thereafter."  *Id.* at 1258.  The court further concluded that the verdict was not against the weight of the evidence with respect to the murder and weapon charges.  *Id.* at 1260.  The New York Court of Appeals subsequently denied Spencer's application for leave to appeal.  35 N.Y.3d 1029 (2020).

In August 2021, Spencer filed a motion ("440 motion") in County Court pursuant to C.P.L. § 440.10, for an order vacating his judgment of conviction on the ground that the prosecution violated its duty under *Brady* and the Due Process Clause to disclose to the defendant favorable evidence known to the prosecution, specifically certain materials relating to Mitchum.  The County Court denied the motion, and the Appellate Division denied leave to appeal.  (SR 813, 871.)

---

[2] The court indicated that the verdict on those counts might have stood had the trial court charged the jury about the doctrine of "transferred intent," which "serves to ensure that a person will be prosecuted for the crime he or she intended to commit even when, because of bad aim or some other 'lucky mistake,' the intended target was not the actual victim."  *Id.* at 1258 (quoting *People v. Fernandez*, 88 N.Y.2d 777, 781 (1996)).

## V. Present Petition

Spencer filed his habeas petition in this Court in June 2022.  In support of his petition, he raises a single, though multifaceted ground for relief, asserting that he "was denied his constitutional rights to confrontation and cross-examination, due process and a fair trial" by the prosecutor, because the prosecutor made "conclusory and misleading ex parte applications for permission to provide Mr. Spencer and his counsel only a small, redacted portion" of recordings, transcripts and police notes from police interviews with Mitchum, which contained material evidence that was favorable to Spencer.  (Dkt. #1 ¶ 14.)  Specifically, Spencer alleges that the prosecutor represented to the trial court that turning over the full transcripts and notes sought by defense counsel would risk compromising pending investigations, but what the prosecutor did not tell the trial court or defense counsel was that the unredacted recordings of the interviews had already been provided to the attorneys for Mitchum and his codefendants in Mitchum's federal prosecution in April 2013.  Nor was the trial court made aware that the unredacted transcripts had been posted on the publicly-available federal PACER website since January 2014, when Mitchum's attorney posted a copy of the transcripts as an exhibit to a suppression motion.  According to Spencer, then, there was no legitimate basis for the state prosecutor's assertion that turning over the unredacted versions might jeopardize any ongoing investigations.

Spencer also asserts that the unredacted materials that his attorney sought contained exculpatory evidence that should have been disclosed pursuant to *Brady*.  Spencer contends that the unredacted materials could have been used by defense counsel to impeach Mitchum's testimony, by showing that Mitchum had animus toward Spencer, that he was dishonest, and that he was telling the police investigators what he thought they wanted to hear, in an effort to get a lower sentence in his federal case.

Spencer raised this claim in his 440 motion, *see* SR 316 ff., and the County Court rejected it both on procedural grounds and on the merits, *see id.* 813-21.  That fact brings into play certain principles that govern this Court's analysis.

First, in reviewing state criminal convictions in a federal habeas corpus proceeding, a federal court does not sit as a super-appellate court.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  A habeas court's "review under section 2254 is not 'a substitute for ordinary error correction through appeal.'  Rather, it 'functions as a guard against extreme malfunctions in the state criminal justice systems.'"  *McCray v. Capra*, 45 F.4th 634, 640 (2d Cir. 2022) (quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011), and *Greene v. Fisher*, 565 U.S. 34, 38 (2011)).

That long-established principle was reinforced by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ... .

28 U.S.C. § 2254(d)(1).

Under AEDPA, then, when a claim has been adjudicated on the merits in state court, federal courts must give deference to the state court's findings and conclusions.  "[T]he federal court must 'focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent.'"  *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir. 2001) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 311-12 (2d Cir. 2001)) (additional citations omitted).  "A state court decision slips into the 'unreasonable application' zone 'if the

-14-

state court identifies the correct governing legal principle from [the Supreme Court's] decision but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)) (modification in original).  A state court decision is reviewed under this standard "only for the reasonableness of its bottom-line result, not the quality of its reasoning." *McCray*, 45 F.4th at 640 (quotations omitted).  The federal court must assess whether the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

As stated, the County Court also based its decision on procedural grounds.  In denying Spencer's 440 motion, the County Court first observed that Spencer "could have raised all these issues [concerning discovery relating to Mitchum] on appeal and failed to do so."  (SR 818.) The court stated that "[t]he law requires denial of a motion to vacate judgment where the allegations are of a nature that would be readily apparent upon the record and the defendant's remedy is to raise the issue on an appeal." *Id.* (citing C.P.L. § 440.10(2)(c)).

The court also stated that it had reviewed the protective orders and the information provided by the prosecution that served as the basis for those orders, and that "After review this court determines that the People's statements made in support of the protective orders are not misleading or conclusory ... ." *Id.*  In addition, the court determined that the prosecution "did not suppress *Brady* evidence," but "lawfully sought protective orders which were granted by the trial court." *Id.* at 819.  The court further rejected Spencer's assertion that the contents of the applications for protective orders and the unredacted discovery material constituted newly-discovered evidence, stating that the material "could have been discovered before the trial with

due diligence" and that the material could not constitute newly discovered evidence because it was "merely impeachment of Mr. Mitchum's testimony." *Id.* at 820 (citing

The County Court, then, rejected Spencer's claims both on procedural grounds and on the merits. To the extent that the court's decision was based on a procedural bar due to Spencer's failure to raise these claims on direct appeal, that constitutes an independent and adequate state-law ground that bars this claim from federal habeas review. *See Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (finding § 440.10(2)(c) an "adequate state procedural bar to Clark's federal habeas petition"); *Brooks v. Ricks*, No. 02-CV-1671, 2003 WL 22956962, at *13 (E.D.N.Y. Oct. 20, 2003) (*Brady* claim was precluded from federal habeas review, because petitioner had raised it in his 440 motion, which state court denied pursuant to § 440.10(2) because claim could have been raised on direct appeal).

That is so even though the County Court also rejected the claim on the merits. The principle that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that "is independent of the federal question and adequate to support the judgment," *Cone v. Bell*, 556 U.S. 449, 465 (2009), "applies even if the state court alternatively rules on the merits of the federal claim, so long as there is an adequate and independent state ground that would bar the claim in state court." *Krouth v. Amoia*, No. 15-CV-6616, 2018 WL 1523627, at *5 (W.D.N.Y. Mar. 28, 2018) (internal quote and citation omitted). *See also Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law").

"In all cases in which a state petitioner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The "miscarriage of justice" exception to the procedural-default bar generally means that the petitioner must show that he is "actually innocent" of the crime of conviction. *Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

The County Court indisputably relied upon a procedural bar, finding that Spencer's claims could and should have been raised on direct appeal. As stated, the fact that this was an alternative ground for the court's decision does not mean that there is no procedural default. *See Murden v. Artuz*, 497 F.3d 179, 191 (2d Cir. 2007). The question is whether this constituted an "independent and adequate" ground for the County Court's decision.

Since the court relied on a state procedural rule, C.P.L. § 440.10(2)(c), its decision was clearly independent of federal law. The parties here dispute, however, whether that decision was "adequate."

"To determine whether a state procedural bar is 'adequate to support the judgment,' a federal habeas court should look to whether 'the state rule at issue ... is firmly established and regularly followed.'" *Clark v. Perez*, 510 F.3d 382, 391 (2d Cir. 2008) (quoting *Coleman*, 501 U.S. at 729), and *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007)). "This inquiry focuses on whether the case before the court fits within the limited category of 'exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to

stop consideration of a federal question.'" *Id.* (quoting *Lee v. Kemna*, 534 U.S. 362, 376

(2002)).

"The Court of Appeals for the Second Circuit has ... expressly and repeatedly held that

the provisions of New York Criminal Procedure Law Section 440.10(2)(c) precluding a

defendant from mounting a collateral attack in state court on the basis of claims that could have

been raised on direct appeal is an adequate and independent ground to deny federal habeas

review." *Green v. Lee*, No. 14 Civ. 6344, 2016 WL 110524, at *4 (S.D.N.Y. Jan. 8, 2016)

(citing cases).  But the habeas court cannot simply look at the relevant state-law ground in the

abstract.  "[T]he question is whether application of the procedural rule is firmly established and

regularly followed in the specific circumstances presented in the case, an inquiry that includes an

evaluation of the asserted state interest in applying the procedural rule in such circumstances."

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (internal quotation marks omitted).

Consideration of that question involves an inquiry into "whether state caselaw indicated that

compliance with the rule was demanded in the specific circumstances presented ... ." *Waters v.*

*Lilley*, No. 17-CV-8258, at *8 (S.D.N.Y. Apr. 14, 2023) (citing *Cotto*, 331 F.3d at 217)

(additional cite omitted).  *See*, *e.g.*, *Lawrence v. Graham*, No. 12-CV-814, 2014 WL 585301, at

*7 (W.D.N.Y. Feb. 13, 2014) (concluding that state court's reliance on a procedural rule was

"adequate" under *Coleman* where "[t]he Court's survey of the pertinent caselaw confirm[ed] that

this rule has been regularly and consistently applied in circumstances akin to those presented by

Petitioner's case"); *Clarke v. Goord*, No. 07-CV-366, 2007 WL 2324965, at *2 (E.D.N.Y. Aug.

10, 2007) (finding that "the § 440 Court misapplied N.Y.C.P.L. § 440.10(2)(c)" on the facts of

the case, and that therefore "the § 440 Court's misapplication of it in this case cannot bar habeas

review") (footnote omitted).

Spencer contends that the County Court's statement that the claims concerning the Mitchum notes, transcripts and recording had to be raised on direct appeal was incorrect, because the claims were based on information that was not part of the record.  Spencer argues that the County Court's ruling was therefore not based on a state ground that is "firmly established and regularly followed."

Having reviewed the relevant parts of the record, this Court disagrees with Spencer's characterization of the state court's decision as inconsistent with New York law.  As the County Court stated in its decision on the 440 motion, the prosecutor's application for a protective order–which included the unredacted notes–was a part of the record, and Spencer could have sought to have it unsealed for purposes of the appeal.  That would have provided a basis for the Appellate Division to assess whether the unredacted documents contained *Brady* material that was not included in the redacted versions, and whether pretrial disclosure of the unredacted versions might have led to a different outcome at trial.

In addition, the fact that the unredacted transcripts had been posted on PACER in Mitchum's federal case was not unavailable to Mitchum's trial and appellate attorneys.  In the 440 decision, the County Court expressly "determine[d] that the unredacted discovery material could have been discovered before the trial with due diligence ...," SR 820, and that determination is supported by the record.  Spencer's trial attorney was informed over two months before the trial began that Mitchum was under federal indictment and had entered into a plea agreement.  Both he and codefendant Reid's counsel were also well aware that there were materials relating to Mitchum that had not been turned over to them; indeed, that was the source of ongoing discovery disputes both before and during trial.

-19-

Although it would have taken some effort to discover the unredacted Mitchum transcript on PACER, the effort required would not have been immense.  Counsel would not have had to scour through every document and docket entry in Mitchum's case, but could have narrowed the search to documents pertaining to Mitchum, excluding items that were obviously inconsequential or purely ministerial in nature (*e.g.*, routine scheduling orders, speedy-trial exclusions, etc.).  That counsel could have done so is evidenced by the fact that Mitchum's attorney on the 440 motion and the present habeas petition discovered the transcript on PACER, based on the same record that was available to trial and appellate counsel.  I conclude, therefore, that the state court's determination that these matters could and should have been raised on appeal did not amount to an "exorbitant application" of a state procedural rule, *Lee*, 534 U.S. at 376, but rather that it constitutes an adequate and independent ground for the state court's decision.[3]

The question then becomes whether Spencer can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim would result in a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 750.

There are two related ways to establish "cause."  "First, the cause requirement is met if some objective factor, external to petitioner's defense, interfered with his ability to comply with the state's procedural rule."  *Gutierrez*, 702 F.3d at 111 (citing *McCleskey v. Zant*, 499 U.S. 467, 493 (1991)).  "An example of such an objective impediment is 'a showing that the factual or legal basis for a claim was not reasonably available to counsel'" at the time.  *Id.* (quoting

---

[3] The Court is mindful of the fact that trial counsel was in the midst of preparing for trial, and I do not mean to suggest that counsel's failure to discover the unredacted transcripts on PACER sooner was attributable to negligence or simple lack of effort.  The point is that the state court's finding that these claims could have been raised on appeal did not lie so far outside the norms of New York law as to render it an inadequate ground for the court's decision.

*Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999)).  Cause can also be based on futility if "prior state case law has consistently rejected a particular constitutional claim." *DiSimone v. Phillips*, 461 F.3d 181, 191 (2d Cir. 2006).  But "futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (internal quotation marks omitted).

In the case at bar, Spencer has not even asserted, much less demonstrated that there is cause for his default, because he takes the position that there was no default in the first place.  As far as Spencer is concerned, the County Court simply erred in determining that his arguments concerning *Brady* violations in connection with Mitchum's interview notes and transcripts could have been raised on appeal.  As explained above, this Court disagrees with Spencer's contention.

Although he does not frame it in terms of "cause," Spencer does contend that he could not have presented these claims in his direct appeal because the claims are based on facts and evidence that was not a part of the trial record.  For the reasons stated, I find that the state court's determination to the contrary is supported by the facts and consistent with New York law.

The "prejudice" requirement is met by establishing "actual prejudice resulting from the errors of which [petitioner] complains." *United States v. Frady*, 456 U.S. 152, 168 (1982) (internal quotation marks omitted).  The error must have resulted in "substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions." *Murray*, 477 U.S. at 494 (quoting *Frady*, 456 U.S. at 170).

When a habeas petitioner has failed to show cause for a procedural default, the court does not need to reach the question of prejudice, however.  *See Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 127 (2d Cir. 1995) ("Since [petitioner] has failed to show cause, there is no need to address the prejudice requirement, and federal habeas review ... is unavailable"); *Grefer v.*

*Grant*, __ F.Supp.3d __, 2023 WL 6201512, at *12 (W.D.N.Y. 2023) ("The absence of 'cause' obviates the need to consider whether 'prejudice' exists") (citing *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985)).

In any event, Spencer has also made no attempt to show prejudice, and he certainly has not demonstrated any reason to think that he is actually innocent, sufficient to meet the "miscarriage of justice" standard. *See Grefer*, 2023 WL 6201512, at *12 ("Petitioner ... has not attempted to demonstrate that he is actually, factually innocent such that a fundamental miscarriage of justice will occur if this Court does not review the merits of the procedurally barred claims"). As the Appellate Division noted, the prosecution presented evidence that Spencer "shared his codefendant's intent to kill the victim and intentionally aided the codefendant by, *inter alia*, planning the shooting beforehand, informing the codefendant where the victim was located, driving the codefendant to that location, providing the weapon used in the shooting, and driving the codefendant away from the scene immediately thereafter." 181 A.D.3d at 1258. Nothing presented in his present petition suggests that despite all that evidence, Spencer is in fact innocent.

For similar reasons, even if his claims were not procedurally defaulted, Spencer could not show that he was prejudiced by the alleged *Brady* violation. "To establish a *Brady* violation, a defendant must show (1) that the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006) (internal quotation marks omitted). "[A] *Brady* violation occurs only where the government suppresses evidence that could reasonably have been taken to put the whole case in such a different light as to undermine confidence in the

verdict." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (internal quotation marks and alteration omitted).

At the outset, the evidence in question was not "suppressed" by the prosecution.  The unredacted notes, transcripts and recordings were made known and provided to the trial court, which determined that they did not have to be turned over to the defense *in toto*, and that redacted versions would suffice.  Spencer asserts that the trial court's protective orders were based on misleading statements by the prosecutor about the need to avoid jeopardizing ongoing investigations, but the prosecution did not conceal the existence of the evidence.[4]

In addition, in the 440 decision the County Court explicitly "determine[d] that, even if the People had knowledge of the material information posted on the Federal Court website at the time they made their protective order motions, such knowledge does not negate the factors provided by the People in support of their requests for the protective orders, and such knowledge does not render the People's factors as misleading or conclusory."  (SR 819.)  That factual finding "must ... be presumed correct, rebuttable only by clear and convincing evidence." *McGhee v. Annucci*, No. 22 Civ. 5801, 2024 WL 36998, at *4 (S.D.N.Y. Jan. 3, 2024) (citing 28 U.S.C. § 2254(e)), *appeal filed* (2d Cir. Feb. 8, 2024).  Spencer has not presented such evidence.

---

[4] The State contends here that the redactions of the interview transcripts and recordings were not made pursuant to any protective orders, because at the time the prosecutor turned over the redacted versions on March 2, 2015, the trial court's June 9, 2014 protective order was no longer in effect, having been lifted by the court on February 25, 2015.  Spencer responds that the court's February 25 order (SR 111) only applied to Reid, not to Spencer.  On its face, the February 25 order does refer only to Reid, and directs the prosecution to turn over *Rosario* material to "the defendant."

It is not clear who drafted the February 25 order, which contains several handwritten alterations made by Judge Piampiano, or why the caption names only Reid.  There is no apparent reason why the court would have intended it to apply only to Reid, however, and it appears that all the parties interpreted it as applying to both defendants.  In any event, whether or not the redactions were effected pursuant to a protective order is not dispositive of Spencer's habeas claim, which fails for the reasons discussed in the body of this Decision and Order.

Nor has Spencer demonstrated that he was prejudiced by not having the unredacted materials prior to trial.  A review of the State Record shows that even apart from Mitchum's testimony, the evidence of Spencer's guilt was substantial; in fact, the Appellate Division characterized it as "overwhelming."  Most notably, that included evidence that on the day that Reid was shot, May 1, 2012, RPD officers attempted to speak to Spencer, who fled.  Investigator Morales testified that Spencer was wearing a hooded sweatshirt, and that there appeared to be something bulky and heavy inside the pocket, which Spencer was supporting with his hand.  The pursuing officers briefly lost sight of Spencer, but eventually caught up to him and apprehended him.

No weapons were found on Spencer, but a search of the area through which he had run turned up two handguns:  a Smith and Wesson .40 caliber and an AMT .45 caliber.  Later tests showed that fingerprints on the .45 matched Reid's, and ballistics tests confirmed that the rounds that were fired in the April 9, 2012 shooting were fired from that gun.  Tr. 1719, 1840.  Thus, there was strong evidence that on the day of his arrest, Spencer was carrying the murder weapon itself.

Spencer later inadvertently incriminated himself in connection with the weapon.  In a custodial interview in May 2014, the investigator asked Spencer if he remembered pleading guilty "to tossing one of two guns" during a foot chase, and Spencer said yes.  The investigator then stated, "The gun you pled guilty to was the gun used to kill Lawrence Richardson in April of 2012," and Spencer "immediately" responded, "I pled guilty to the .40 caliber Smith and Wesson."  Tr. 1782.[5]  The most obvious reason for Spencer to have responded that way is that he

---

[5] It appears that at some point, Spencer pleaded guilty to attempted possession of a weapon, *i.e.* the .40 caliber Smith and Wesson.  Tr. 1781.

knew that Richardson was not killed with a .40 caliber pistol, and that the reason he knew was that he provided Reid with the .45 that was used to carry out the murder.

Beyond that substantial evidence of guilt, the record also reflects that Mitchum was thoroughly and effectively cross-examined at length by both defense attorneys.  Any incremental benefit that might have accrued to Spencer had his attorney received the full transcripts before Mitchum took the stand would not likely have affected the outcome of the trial.  *See United States v. Montague*, 67 F.4th 520, 538 (2d Cir. 2023) ("Had Montague known about the [allegedly withheld evidence], the outcome in this case would have been the same.  He therefore cannot establish prejudice, an essential element of a *Brady* claim").

The cross-examination of Mitchum by both defense counsel was extensive, covering over 200 pages in the trial transcript.  Their questioning covered Mitchum's federal plea deal, and the benefit he stood to gain if his cooperation was deemed sufficient to warrant a downward departure at sentencing.  Defense counsel also delved into Mitchum's lengthy criminal history, including his use and possession of firearms, his shooting of an unarmed individual at point-blank range in 2012, and his firing a shotgun at a vehicle containing several passengers in 2010.  They questioned him about the fact that three women, by two of whom he had fathered children, had orders of protection against him.  They also pointed out inconsistencies between his grand jury and trial testimony relating to the incident in which Richardson was stabbed, and the fact that it was Mitchum who knocked Richardson off his bike as he was attempting to escape his assailants.

Spencer contends that had his counsel been given the full notes and transcripts, he could have used them to impeach Mitchum about various matters that were not covered at the trial.  As the State sets forth in its response to the petition, however, *see* Dkt. #14 at 38-42, an examination

of the record reveals that the redacted portions of the transcripts and recordings were either not favorable to Spencer or that any cross-examination concerning the statements contained in those portions would have been cumulative or immaterial, and that their pretrial disclosure would not have resulted in a different verdict.

Spencer points, for example, to a portion of the unredacted transcript of the interview with Morales in which Mitchum states that he would have been willing to "take the gun charge," adding, "I honestly feel like it was my fault" because "I gave it to him."[6]  (SR 522.)  Spencer contends that Mitchum was saying that he was the source of the handgun that was used in the shooting.  A short time later in the same interview, however, Mitchum stated, "the forty five that Devonte got caught with, he got it from him on a trade.  ... [Spencer] traded a four four and fifty dollars for a forty five."  (SR 564.)  That was clearly a reference to the .45 caliber gun charged in the indictment, *i.e.*, the firearm Spencer "got caught with."

While those statements may have provided some fodder for cross-examination, this would hardly have been likely to affect the verdict.  Where Spencer got the pistol that he handed to Reid to carry out the shooting was immaterial to the charges against him.

Spencer also cites a part of the interview transcript in which Mitchum is discussing an unrelated shooting involving other individuals, in which he says, "I know if I was in the same situation, I'd have people lie for me."  (SR 533.)  Again, that would have provided some impeachment material, but in the overall context of the trial it would not have been particularly significant.  Mitchum was discussing an unrelated shooting, he was responding to a question

---

[6] It is not entirely clear from the transcript to whom Mitchum was referring at this point; he made this statement in the midst of a discussion about how Mitchum wished he could help Reid, but the transcript also reads, "I told him Devonte ... I told him I'd take the gun charge for him."  Read in context, the reference to Devonte appears to have been part of an unfinished sentence, and that Mitchum meant that he told Reid he would take the gun charge for Reid.

about whether one of the people involved in that matter was trying to get someone to lie for him, and it appears from Mitchum's statements that he believed that individual was taking the fall for the person who actually pulled the trigger.

The other items in the unredacted transcript relied upon by Spencer might likewise have provided some additional bases for inquiry, but the cross-examination would have been cumulative (*e.g.*, statements indicating that Mitchum did not like Spencer and that Mitchum was told by Morales that he would not be charged with in connection with certain activities), or would not have been particularly damaging to his credibility (such as statements indicating that Mitchum had once lied about some matters to protect his brother). The jury was made well aware that Mitchum was testifying pursuant to a cooperation agreement in connection with serious charges pending against him in federal court, and Mitchum stated in his direct testimony that he had a closer relationship with Reid than with Spencer. (Tr. 1175.) For that matter, the interview transcript is consistent with Mitchum's trial testimony that he and Reid were "very good friends," Tr. 1170, yet that did not deter him from implicating Reid in the shooting. While some of Mitchum's statements in the interview with Morales indicated that he did not particularly like or respect Spencer, nothing in the transcript suggested that his testimony was a fabrication motivated by animus toward Spencer. In short, the redacted portions of the Mitchum materials did not contain any bombshells that, had they been known to defense counsel, would likely have changed the outcome of the trial.

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus (Dkt. #1) is DENIED.

Because petitioner has not made a substantial showing of the denial of a constitutional right, 28

U.S.C. § 2253(c)(2), I decline to issue a certificate of appealability.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
        March 13, 2024.